IN THE UNITED STATES DISTRICT COURT

FILED

NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

99 NOV 23 PM 1: 34

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| MARVIN L. GOLDSBY, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | CV 98-H-2285-S |
| VAE NORTRAK, INC., | ) | |
| DEFENDANT. | ) | |

**ENTERED**

NOV 23 1999

### MEMORANDUM OF DECISION

The Court has before it the September 1, 1999 motion for summary judgment of defendant VAE Nortrak, Inc. ("Nortrak"). Pursuant to the Court's September 3, 1999 order, the motion was deemed submitted, without oral argument, on October 1, 1999.

### I. Procedural History

Plaintiff Marvin L. Goldsby commenced this action on September 8, 1998 by filing a complaint in this Court, alleging racial discrimination and retaliatory discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) et seq., and 42 U.S.C. § 1981. Plaintiff specifically contends that, because of his race and his prior filing of an EEOC charge against defendant, defendant denied him promotions, transfers, and pay raises, and retaliated against him. Defendant's September 1, 1999 motion for summary judgment

35

and accompanying brief assert that no genuine issue of fact

exists and that defendant is entitled to judgment as a matter of

law.  On October 4, 1999, plaintiff filed a memorandum of law in

opposition to defendant's motion and on October 18, 1999,

defendant filed a brief in reply.  Both parties have submitted

evidence in support of their respective motions.[1]

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary

judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment

as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322

---

[1]Defendant submitted excerpts from plaintiff Goldsby's March
31, 1999 deposition; the Complaint filed on July 13, 1995 in the
matter of Steven Spencer, Alvin B. Spencer, Marvin Goldsby, Jr.,
and Keith Mitchell v. Nortrak, Inc., CV 95-C-1789-S; the Final
Judgment and Permanent Injunction entered in CV 95-C-1789-S;
plaintiff's Charge of Discrimination filed with the EEOC on
September 5, 1997; a Notice of Right to Sue letter issued to the
plaintiff by the EEOC on November 5, 1997; the affidavit of James
Yaskowich; the affidavit of Jay Cobbs and various exhibits
attached thereto; exhibits and excerpts from the trial transcript
of CV 95-C-1789-S; and payroll records of Scott Cornelius and
Randy Spradlin.

Plaintiff has submitted the affidavits of Marvin L. Goldsby,
Gary Story, Randy Spradlin, and Henry L. Penick as well as three
letters from Henry L. Penick to the EEOC dated October 20, 1997,
January 6, 1998, and May 28, 1998.

2

(1986). The party asking for summary judgment always bears the
initial responsibility of informing the court of the basis for
its motion and identifying those portions of the pleadings or
filings which it believes demonstrate the absence of a genuine
issue of material fact. Id. at 323. Once the moving party has
met his burden, Rule 56(e) requires the nonmoving party to go
beyond the pleadings and by his own affidavits, or by the
depositions, answers to interrogatories, and admissions of file,
designate specific facts showing that there is a genuine issue
for trial. Id. at 324.

The substantive law will identify which facts are material
and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 248 (1986). All reasonable doubts about the facts and
all justifiable inferences are resolved in favor of the non-
movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th
Cir. 1993). A dispute is genuine "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Anderson, 477 U.S. at 248. If the evidence is merely colorable,
or is not significantly probative, summary judgment may be
granted. Id. at 249.

The method used by the party moving for summary judgment to
discharge its initial burden depends on whether that party bears

the burden of proof on the issue at trial.  See Fitzpatrick, 2

F.3d at 1115-17 (citing United States v. Four Parcels of Real

Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the

moving party bears the burden of proof at trial, then it can only

meet its initial burden on summary judgment by coming forward

with positive evidence demonstrating the absence of a genuine

issue of material fact; i.e. facts that would entitle it to a

directed verdict if not controverted at trial.  Fitzpatrick, 2

F.3d at 1115.  Once the moving party makes such a showing, the

burden shifts to the non-moving party to produce significant,

probative evidence demonstrating a genuine issue for trial.

     If the moving party does not bear the burden of proof at

trial, it can satisfy its initial burden on summary judgment in

either of two ways.  First, the moving party may produce

affirmative evidence negating a material fact, thus demonstrating

that the non-moving party will be unable to prove its case at

trial.  Once the moving party satisfies its burden using this

method, the non-moving party must respond with positive evidence

sufficient to resist a motion for directed verdict at trial.

     The second method by which the moving party who does not

bear the burden of proof at trial can satisfy its initial burden

on summary judgment is to affirmatively show the absence of

4

evidence in the record to support a judgment for the non-moving
party on the issue in question.  This method requires more than a
simple statement that the non-moving party cannot meet its burden
at trial but does not require evidence negating the non-movant's
claim; it simply requires the movant to point out to the district
court that there is an absence of evidence to support the non-
moving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the
movant meets its initial burden by using this second method, the
non-moving party may either point out to the court record
evidence, overlooked or ignored by the movant, sufficient to
withstand a directed verdict, or the non-moving party may come
forward with additional evidence sufficient to withstand a
directed verdict motion at trial based on the alleged evidentiary
deficiency.  However, when responding, the non-movant can no
longer rest on mere allegations, but must set forth evidence of
specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing
Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts

Plaintiff began his employment with Nortrak in March of
1994.  (Def. Exhibit 8-H.)  He was hired as a "Frog Fitter I"[2]

---

[2]A "Frog Fitter" is an employee who fabricates various
"frogs," which are railroad rail components that allow a train on

5

and his rate of pay was $9.00 per hour.  (Id.)  Between 1994 and

1996, Goldsby progressed to the position of Frog Fitter I D-3,

wherein his pay was $10.95 per hour.[3]  (Id.)  On October 7, 1996,

Goldsby was transferred from Frog Fitter to Bender;[4] he was

placed in the Operator 2 D-2 position and his pay was increased

to $11.20 per hour.  (Id.)  Between 1996 and 1999, Goldsby was

promoted to an Operator 3 C-2 Bender position at $12.70 per

hour.[5]  (Id.)  The Operator 3 C-2 position is the highest pay

---

one set of tracks to curve to the right or left to another set of
tracks.  The frog fitting positions consist of Assemblyman, Frog
Fitter, and Track Technician.  Assemblyman is the entry-level
position, which is a Grade D position.  (Yaskowich Aff. ¶ 5.)

[3]On February 5, 1995, Goldsby was promoted from Frog Fitter
D to Frog Fitter I D-1 at a pay rate of $10.20 per hour; on May
6, 1995, Goldsby was promoted to a Frog Fitter I D-2 at a pay of
$10.70 per hour; on October 12, 1995, Goldsby got a raise in the
Frog Fitter I D-2 position from $10.45 to $10.70 per hour; and on
March 20, 1996, Nortrak promoted Goldsby to a Frog Fitter I D-3
at an hourly wage of $10.95 per hour. (Def. Exhibit 8.)

[4]A "Bender" describes an employee who uses various processes
to bend railroad rails to meet specifications so that they may be
used in the manufacture of products such as switches, stock
rails, switch points, and forged transition rails.  (Yaskowich
Aff. ¶ 4.)

[5]On May 25, 1997, Goldsby was promoted from Operator 2 D-2
to Operator 3 C-1 and his pay was increased from $11.20 to $11.75
per hour, and then to $12.00 per hour on January 5, 1998; on
March 23, 1998 he was promoted to Operator 3 C-2 at a pay rate of
$12.50 per hour; and on January 4, 1999, his rate of pay was
increased in the Operator 3 C-2 position to $12.70 per hour.
(Def. Exhibit 8.)

classification of the Bender Operator positions.  (Id.)

At some point in March 1998, Goldsby spoke with a
supervisor, James Yaskowich, regarding positions which pay more
than the Operator 3 C-2 position. (Pl. Depo., p. 62; Yaskowich
Aff. ¶ 8.)  Yaskowich told plaintiff that he would have to either
bid on an available entry-level machinist position or return to
frog-fitting and resume his progression, which he left in October
of 1996 as a Frog Fitter I D-3. (Yaskowich Aff. ¶ 8.)  Yaskowich
told plaintiff further that he needed machinists and would train
him in one of these positions. (Yaskowich Aff. ¶ 8.)  Plaintiff,
however, did not express interest in changing to a machinist
position, and told Yaskowich that he was "happy where he was at."
(Pl. Depo., p. 63, 64; Yaskowich Aff. ¶ 8.)  Plaintiff at no time
relevant to the present action ever actually bid on or applied
for any machinist or frog fitting position which would have
allowed him to make more than he made as a Bender in the Machine
Operator 3 classification.  (Yaskowich ¶ 9.)

The present action is not plaintiff's first action against
Nortrak.  On July 13, 1995, Marvin Goldsby, Steven Spencer, Alvin
B. Spencer, and Keith Mitchell, filed suit against Nortrak,
alleging collectively that defendant "discriminated against them
with respect to promotion, assignments, pay, discipline

7

(including discharge) and other terms, conditions, and privileges

of employment."  (See Def. Exhibit 2.)  Plaintiffs alleged

further that defendant continuously retaliated against them for

having complained about defendant's unfair labor practices.  (See

Def. Exhibit 2.)  Plaintiffs also asserted individual claims, and

Goldsby complained as follows:

> Plaintiff avers that he was past [sic] over for
> promotions and that defendant promoted white employees
> with less experience, who had been trained by
> plaintiff, Goldsby.

> Plaintiff avers that defendant's failure to promote him
> was based on his race.

> Plaintiff avers that defendant failed to post job
> vacancies which resulted in racial discrimination
> against plaintiff and other black employees who are not
> aware of promotional opportunities.

> Plaintiff avers that defendant tolerated racial jokes
> and slurs in the work place.

> Plaintiff avers that defendant discriminated against
> him and other black employees with respect to
> promotions, job assignments, compensation, discipline,
> and other terms and conditions of employment.

> Plaintiff avers that defendant discriminated against
> him and retaliated against him by hiring and paying
> white employees with less seniority, experience, and
> abilities a higher rate of pay and by giving them
> larger raises than paid to plaintiff.

> Plaintiff avers that defendant retaliated against him
> by its refusal to promote him, by denying him equal
> pay, by subjecting his work to stricter scrutiny, by
> stricter discipline, and by harassing him in his

employment.

(Def. Exhibit 2)(paragraph numbers omitted).  On March 27, 1997,

a jury returned a verdict for plaintiffs Steven Spencer and Keith

Mitchell, finding that defendant Nortrak discriminated against

them in violation of Title VII.  Plaintiffs Goldsby and Alvin B.

Spencer, however, recovered nothing in this suit.  (See Def

Exhibit 4.)

On September 5, 1997, Goldsby filed a second charge of

discrimination against Nortrak with the Equal Employment

Opportunity Commission (EEOC).  (See Def. Exhibit 5.)  Two months

later, on November 5, 1997, the EEOC issued Goldsby a right to

sue letter,[6] and on September 8, 1998, Goldsby filed the present

suit.  Plaintiff now alleges as follows:

> On account of Plaintiff's race the defendant
> discriminated against him with respect to promotions,
> evaluations, and other terms and conditions of
> employment.

------

[6]The parties dispute when plaintiff actually received the
EEOC right to sue letter for the purposes of determining when the
90 day filing deadline under 42 U.S.C. § 2000e-5(b)(1) expired.
Plaintiff argues that because the letter was mailed to his
attorney, and not to him directly, he did not get the letter
until far later than the November 5, 1997 date of issuance.
While plaintiff has presented no evidence setting forth a
specific date on which he received the letter, he does allege in
his complaint that he "timely filed his complaint within 90 days
of the receipt of his right to sue letter . . . ."  (Compl. ¶ 2.)
Defendant claims that plaintiff's suit is time-barred.

> Plaintiff avers that he has been passed over for
> promotion and that white employees with less
> experience, whom plaintiff has trained, have [been]
> promoted over him.

> Plaintiff avers that he has not received evaluations
> and pay raises commensurate with similarly situated
> white employees. On or about August 23, 1994,
> plaintiff filed a previous charge of race
> discrimination against defendant. Plaintiff claims
> that since the filing of said charge he has been
> continually harassed by management.

> Plaintiff avers that the above mentioned retaliation is
> due to plaintiff having filed a previous EEOC claim
> against defendant.

(Compl. ¶¶ 6-9) (paragraph numbers omitted).

In the present suit, several of plaintiff's complaints pre-

date his March 1997 trial against Nortrak. With respect to his

promotion and pay claims, plaintiff alleges that, at the time of

his October 1996 transfer from Frog Fitter to Bender, he was

unaware that the effect of the transfer was to remove him from

the frog fitting line of progression.[7] (See Pl. Memorandum of

Law in Opposition to Defendant's Motion for Summary Judgment

---

[7]Plaintiff argues in his brief that racial animus was the
cause of the transfer. He states in his deposition, however,
that he believed he was transferred for non-discriminatory
reasons, i.e. because other Benders were on the verge of losing
their jobs for various disciplinary reasons and help was needed
in the Bender department. (Pl. Depo., p. 59-60.)

10

("Pl. Memo"), p. 8; Pl. Aff. ¶ 8.)  Plaintiff claims that he did
not become aware of this fact until some point after September
1997.  (Pl. Memo, p. 8-9.)  Plaintiff also claims that he trained
several employees, including David Smith, James McGill, and Hardy
Kuykendall, who have received numerous promotions and who are
"now making more or equal to plaintiff, even though plaintiff has
more seniority and experience [than each of these employees]."
(Pl. Memo, p. 9.)  Plaintiff further contends that several white
employees received higher pay and more frequent raises than him.
Plaintiff claims additionally that, in 1997, "and again after the
lawsuit," he  wanted to work the third shift, but his requests
were denied.  (Pl. Depo., p. 57.)  Finally, plaintiff claims
that, in November 1998, he was denied a "lead man position" for
Frog Fitters on the third shift.  (Pl. Aff., ¶ 21.)  Plaintiff
contends that "[t]he company announced the position then withdrew
it once plaintiff expressed a desire for the position."  (Pl.
Aff., ¶ 21; Pl. Memo., p. 18.)

    Regarding his claim of disparate terms and conditions of
employment, plaintiff claims that he was injured in September
1997 while operating a bender, and that another of plaintiff's
supervisors, Charles Murphy, refused to allow him to get
immediate medical attention.  (Pl. Aff. ¶ 25; Pl. Memo, p. 12.)

Plaintiff claims that Carey Moore, a white employee who operates a "Flash Butt Welder," suffered an identical injury and was given immediate medical attention. (Pl. Memo, p. 12.) Plaintiff also claims that he is subjected to stricter scrutiny by his supervisors and that he is required to do tasks that other employees are not required to do.

Finally, with respect to his retaliation claim, plaintiff re-alleges the claims set forth in support of his discrimination claim, and further claims that Randy Spradlin, a frog shop supervisor, called him a "troublemaker." (Pl. Aff., ¶ 20.) Plaintiff also notes an alleged November 1996 incident in which Don Washburn, plaintiff's supervisor, told plaintiff's on-the-job trainer to "slow down for blacks." (Pl. Aff., p. 23.) Plaintiff claims not to have known about either Spradlin or Washburn's alleged comments until one week prior to his March 1997 trial. (Pl. Memo, p. 12.)

In sum, the alleged discriminatory conduct for which plaintiff seeks relief dates from October 1996 to November 1998. In spite of plaintiff's March 1997 trial against Nortrak, plaintiff is currently seeking to recover for much of the same alleged conduct and for several of the same claims asserted in the first suit, including failure to promote, disparate pay and

12

treatment, and retaliation.

## V.  Applicable Substantive Law and Analysis

Plaintiff seeks redress under 42 U.S.C. § 1981 for alleged

adverse employment decisions made on the basis of plaintiff's

race and for alleged retaliation prompted by plaintiff's prior

filing of a charge of discrimination against defendant.[8]

Although plaintiff seeks to recover for alleged conduct occurring

between October 1996 and November 1998, only those acts arising

subsequent to March 1997 may serve as a basis for recovery.

Those claims which were raised or that could have been raised in

the March 1997 trial between plaintiff and defendant are barred

---

[8]In addition to his section 1981 claim, plaintiff also
asserts a claim under Title VII.  Whether plaintiff could even
maintain his Title VII claim is questionable considering that his
complaint was not filed until roughly ten months after the EEOC
mailed plaintiff's right to sue letter to plaintiff's attorney.
See 42 U.S.C. § 2000e-5(f)(1) (providing that a claimant has
within 90 days after the issuance of a right to sue letter to
file a complaint under Title VII).  However, because the prima
facie case is identical for section 1981 and Title VII claims,
Jones v. Firestone Tire and Rubber, 977 F.2d 527, 536 (11th Cir.
1992), and because recovery of compensatory and punitive damages
under section 1981 is not subject to limitations imposed by 42
U.S.C. § 1981a(b)(3), this Court will not address the timeliness
issue or plaintiff's Title VII claim.  Instead, plaintiff's
claims will be analyzed under section 1981 only.  Further, by
virtue of section 1981a(a)(1), plaintiff likely could not recover
any compensatory or punitive damages in his Title VII claim.

by res judicata.[9]   See NAACP v. Hunt, 891 F.2d 1555, 1561 (11th

Cir. 1990) ("[R]es judicata operates to preclude not only the

issues raised in the prior action, but issues which could have

been raised in the prior action."). Thus, the Court will not

discuss plaintiff's October 1996 transfer from the position of

Frog Fitter to Bender or plaintiff's claim that he was not

allowed to work the third shift.[10] Nor will the Court discuss

Randy Spradlin's alleged "troublemaker" comment or Don Washburn's

alleged racially derogatory comment, both of which were made, if

at all, prior to the March 1997 trial. Further, because James

McGill and David Smith were used as comparators in the first

trial, plaintiff's promotion and pay claims concerning McGill and

Smith will not be discussed in connection with the pending

motion.   The claims not barred by res judicata are addressed

---

[9]Acts occurring before the March 1997 trial may be relevant
for the purposes of determining which alleged acts after March
1997 may be redressed.   In no event, however, could these earlier
acts form the basis of plaintiff's recovery because they are
barred by res judicata.

[10]Plaintiff stated in his deposition that "in [19]97, and
then again after the lawsuit," he talked with Don Washburn, his
supervisor, about working the third shift.   (Pl. Depo., p. 57.)
Plaintiff stated at another point that "[t]he third shift is the
shift I have always wanted to work ever since I came into the
plant."   (Pl. Depo., p. 53.)   Clearly, plaintiff could have
litigated his claim concerning the third shift in the March 1997
trial.

14

separately below.

A.    Failure to Promote

    To establish a claim of discriminatory failure to promote,

plaintiff must show that "1) plaintiff belongs to a protected

class; 2) that plaintiff applied and was qualified for a job for

which the employer was seeking applicants; 3) that, despite

plaintiff's qualifications, he was rejected; and 4) that, after

plaintiff's rejection, the position remained open and the

employer continued to seek applicants from persons of plaintiff's

qualifications."   Jones v. Firestone Tire and Rubber Co., 977

F.2d 527, 536 (11th Cir. 1992).

    Plaintiff claims that he "has been passed over for

promotions and that white employees with less experience, whom

plaintiff has trained, have been promoted over him."   (Compl. ¶

7.)   Specifically, plaintiff identifies a supervisor's positions

and a "lead man frog position" as the basis for his failure to

promote claim.[11]   (See Pl. Aff ¶ 21; Pl. Memo, p. 11; Pl. Depo.,

_____

    [11]The record is unclear as to precisely which supervisor's
position plaintiff is referring.   In his deposition, plaintiff
alleges that Brian Williams received a promotion to supervisor,
but makes no other mention of Williams in his Brief or other
submissions.   In his Memo and his own affidavit, plaintiff
identifies Randy Spradlin as an employee who was promoted over
him to supervisor.   However, when asked in his deposition whether
he could identify any person other than Brian Williams who was

p. 97-98.)  As defendant correctly points out, however, plaintiff never actually sought or applied for any position.  Plaintiff himself acknowledges that he did not inquire about the supervisor's position or ask to complete an application.  (See Pl. Depo., p. 34.)  In fact, defendant stated with regard to the position:  "when I found out how much it was paying, it really wasn't my thing to do [because] the money wasn't there."  (Pl. Depo., p. 34.)  When asked if he would have rejected the supervisor's position had it been offered to him, plaintiff replied "yes."  (Id.)

Because plaintiff has not proved that he ever applied for an available position, he has not satisfied the second element of the prima facie case of discriminatory failure to promote. Accordingly, the other elements need not be addressed and defendant is entitled to judgment in its favor on plaintiff's failure to promote claim.

B.   Disparate Pay

To establish a prima facie case of discrimination in pay or compensation, the plaintiff must show that he was paid less than

---

promoted to an open position, plaintiff responded "no," and said nothing about the Spradlin promotion.  (See Pl. Depo., p. 97-98.)

similarly situated employees of a different race for work

requiring substantially the same responsibility.  <u>Walton v. Cowin</u>

<u>Equipment Co.</u>, 774 F. Supp 1343, 1345 (N.D. Ala. 1991) (citing

<u>Pittman v. Hattiesburg Mun. Separate School Dist.</u>, 644 F.2d 1071,

1074 (5th Cir. 1981)).  Plaintiff alleges that he has not

received pay raises commensurate with similarly situated white

employees.  (Compl. ¶ 8.)  Plaintiff identifies Hardy Kuykendall

and Scott Cornelius as white employees who have been treated

differently from him with regard to pay.[12]  (See Pl. Aff., ¶¶ 13,

14; Pl. Memo, pp. 10-11.)

As an initial matter, Hardy Kuykendall can not properly be

used as a comparator because he and plaintiff occupied different

positions over much of the relevant period.[13]  <u>See</u> <u>Holifield v.</u>

<u>Reno</u>, 115 F.3d 1555, 1561 (11th Cir. 1997) ("To make a comparison

of the plaintiff's treatment to that of non-minority employees,

the plaintiff must show that he and the employees are similarly

situated in all relevant aspects.").  However, even if Kuykendall

---

[12]As stated previously, plaintiff also identifies James
McGill and David Smith as comparators; however, a consideration
of claims with regard to these individuals is barred by res
judicata.  <u>See</u> text, <u>supra</u>, at 14.

[13]The "relevant period" covers only those dates subsequent
to the March 1997 trial because of the bar of res judicata.

17

were an appropriate comparator, plaintiff has not shown that

Kuykendall ever made more money than he.   In fact, Kuykendall

actually earned less than plaintiff up until January 5, 1999, at

which point plaintiff and Kuykendall began earning the same

amount per hour.[14]   Similarly, Scott Cornelius received the same

hourly pay and Cornelius received pay increases less frequently

or as frequently as plaintiff during the relevant period.[15]

Because plaintiff has failed to show that he was paid less than a

similarly situated white employee, his discriminatory pay claim

also must fail.

C.   Disparate Terms and Conditions of Employment

Plaintiff alleges first, that, in September 1997, he was

---

[14]   In June 1997, Kuykendall held the position of
Assemblyman D-1, wherein his hourly rate of pay was $10.70.   In
September 1997, Kuykendall was promoted to the Operator 2 D-2
position and was making $11.20 per hour.   In December 1997
Kuykendall was moved from Operator 2 D-2 to Operator 3 C-1 and
was making $11.75 per hour.   This December 1997 promotion put
Kuykendall and plaintiff in the same Operator 3 C-1 position.   At
all times prior to December 1997, plaintiff and Kuykendall
occupied different positions.
(See Def. Exhibit 8-I, 8-J.)

[15]Cornelius received only one promotion after March 1997; he
was promoted in April 1997 from Operator 2 D-2 to Operator 3 C-1
and his pay rate was $11.75 per hour.   In September 1997,
Cornelius was terminated.   At the time of the termination,
plaintiff and Cornelius were paid at the same rate of $11.75 per
hour.

18

denied immediate medical attention after being injured on the
job.  (See Pl. Aff., ¶ 25.)  As a comparator, plaintiff
identifies a white employee whom he asserts suffered a similar
injury and who was given immediate medical attention and allowed
light duty by defendant.  Plaintiff, however, has offered no
evidence in support of this assertion: he has not shown that the
nature or scope of the injuries were similar or that the
circumstances surrounding his injury were similar to those of the
named comparator.  Without sufficient evidence to show disparate
treatment under similar circumstances, defendant's summary
judgment is due to be granted as to this claim.

Plaintiff also asserts that he was required to do tasks that
other Benders were not required to do, including "finish
grinding" and "frog fitting."  (See Pl. Memo, p. 19.)  Once
again, there is a total lack of evidence from plaintiff
sufficient to establish a prima facie claim of disparate terms
and conditions of employment associated with the assignment of
work tasks.

D.   Retaliation Claim

Finally, plaintiff asserts that defendant retaliated against
him for filing a prior charge of discrimination against it.
Specifically, plaintiff alleges that since August of 1994, the

19

date which plaintiff filed the prior charge, he has been "continually harassed by management." (Compl. at ¶¶ 8,9.) Defendant contends that a claim for retaliation may not be pursued under section 1981, and maintains further that, even if the claim is recognized, plaintiff has not established a prima facie case. While a retaliation claim under section 1981 is cognizable, See Andrews v. Lakeshore Rehabilitation Hosp., 140 F.3d 1405, 1412-1413 (11th Cir. 1998); Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1007 (11th Cir. 1997), defendant is correct that plaintiff has not established a prima facie case.

To establish a prima facie case of retaliation, plaintiff must show 1) that he engaged in a statutorily protected expression; 2) that he suffered an adverse employment action; and 3) that there is some causal relationship between the two events. Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998); Meeks v. Computer Assoc., Int'l, 15 F.3d 1013, 1020 (11th Cir. 1994). In filing his EEOC charge, plaintiff engaged in statutorily protected expression. Plaintiff has not, however, satisfied the second prong of the prima facie case. Plaintiff claims that he has suffered adverse employment action insofar as "defendant's refusal to promote him or move him back into the

20

line of progression of Frog Fitters . . . ."  (Pl. Memo at 16-17.)  Plaintiff also sets forth essentially the same barrage of complaints relied on in his discrimination claim, including that he was unable to work the third shift; that he was denied a lead man position for Frog Fitters on the third shift; that he was called a "troublemaker" by his supervisor; that he did not receive pay raises commensurate with other employees; and that "he was required to do tasks that other benders were not required to do."  (See Pl. Memo at 17-19.)

None of plaintiff's complaints, either viewed alone or in conjunction, amount to adverse employment action sufficient to support plaintiff's retaliation claim.  Doe v. DeKalb Co. School, 145 F.3d 1441, 1450 (11th Cir. 1998) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (11th Cir. 1997) ('[R]etaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.')).  As defendant correctly asserts, "while adverse employment action is not limited to ultimate employment decisions, such as decisions to hire or discharge, not every unkind act is actionable adverse action."  Wu v. Thomas, 996 F.2d 271, 273, n.3 (11th Cir. 1993) (per curiam) (internal citations and quotation marks omitted).

Plaintiff has simply failed to demonstrate that he has
suffered an adverse employment action.  Plaintiff has provided a
laundry list of complaints expressing dissatisfaction with his
job; however, "not everything that makes an employee unhappy
constitutes unlawful retaliation."  See Doe, 145 F.3d at 1450
(quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d
Cir. 1997)).  Because plaintiff has failed to establish a prima
facie case, his retaliation claim must fail as a matter of law.

In summary, the Court finds that no material issues of fact
exist and that defendant Nortrak is entitled to judgment as a
matter of law as to all claims asserted by plaintiff.  A separate
order will be entered.

DONE this 23rd day of November, 1999.

SENIOR UNITED STATES DISTRICT JUDGE

22